**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. _____ |
| Plaintiff, | |
| v. | |
| FIRESTAR INTERNATIONAL LTD., FIRESTAR DIAMOND INTERNATIONAL PRIVATE LTD., FIRESTAR DIAMOND LTD., FIRESTAR HOLDINGS LTD., FIRESTAR DIAMOND BVBA, NIRAV MODI LTD., DIAMONDS 'R' US, SOLAR EXPORTS, STELLAR DIAMONDS, | |
| Defendants. | |

**<u>COMPLAINT</u>**

# TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................................... 1

JURISDICTION AND VENUE ..................................................................................................... 1

THE PARTIES AND OTHER RELEVANT ENTITIES ............................................................. 2

    A.    The Debtors and Trustee ................................................................................................ 2

    B.    The U.S. Affiliates .......................................................................................................... 3

    C.    The LOU Entities ............................................................................................................ 3

    D.    The Debtors' Foreign Affiliates ................................................................................... 4

BACKGROUND ............................................................................................................................. 5

    A.    The Mechanics of the Bank Fraud .............................................................................. 7

    B.    Detection and Exposure of the Bank Fraud .............................................................. 12

    C.    The U.S. Entities' Role in the Bank Fraud ............................................................... 14

    D.    The LOU Entities' Role in the Bank Fraud .............................................................. 16

    E.    The Trustee's Claims Against the LOU Entities ..................................................... 18

    F.    The Foreign Affiliates' Role in the Bank Fraud ..................................................... 19

    G.    The Trustee's Claims Against the Foreign Affiliates ............................................. 24

COUNTS ....................................................................................................................................... 28

PRAYER FOR RELIEF .............................................................................................................. 63

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or "**Plaintiff**") for Debtors Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc., f/k/a A. Jaffe, Inc. (collectively, the "**Debtors**"), and as holder of a joint and several judgment against, and as assignee of all claims of, Synergies Corporation ("**Synergies**"), Firestar Group, Inc. ("**FGI**"), Firestar Diamond International, Inc. ("**FDII**"), Nirav Modi, Inc. ("**NMI**"), and AVD Trading, Inc. ("**AVD**") (collectively, the "**U.S. Affiliates**," and together with the Debtors, the "**U.S. Entities**") for his Complaint alleges as follows:

## NATURE OF THE ACTION

1.      The Trustee brings this action, comprising claims vested in the Trustee, claims belonging to the Debtors, and claims assigned to the Trustee by the U.S. Affiliates, against Defendants Diamonds 'R' Us, Solar Exports, Stellar Diamonds, Firestar Diamond BVBA, Firestar Diamond International Private Limited, Firestar Diamond Limited, Firestar Holdings Limited, Firestar International Limited, and Nirav Modi Limited (collectively, the "**Defendants**"). Each of the Defendants conspired with and participated in the criminal conduct of Nirav Modi, the indirect controlling majority shareholder of all the U.S. Entities, from at least 2010 to mid-2018 (the "**Relevant Period**").

2.      By this action, the Trustee seeks to avoid and recover actual fraudulent transfers made to or for the benefit of the Defendants by the U.S. Entities. These transfers diverted millions of dollars of the U.S. Entities' assets for the benefit of Nirav Modi, his family, and other co-conspirators, and also caused the collapse of the U.S. Entities and the resulting loss of value of their businesses.

## JURISDICTION AND VENUE

3.      The United States District Court for this district (the "**District Court**") has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) because this adversary

proceeding arises under title 11 of the United States Code and arises in and is related to these chapter 11 cases. This Court has authority to hear this adversary proceeding by reason of the District Court's referral under 28 U.S.C. § 157(a) and under General Order M-431 (Amended Standing Order of Reference).

4.     This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(H) and (O).

5.     To the extent that this Court does not have authority to determine the claims asserted in this adversary proceeding and to enter final judgment thereon, the Trustee consents to the issuance and entry of a final judgment or order by this Court.

6.     Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

THE PARTIES AND OTHER RELEVANT ENTITIES

*A.     The Debtors and Trustee*

7.     Debtor Firestar Diamond, Inc. (formerly known as Firestone, Inc.) ("**FDI**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, FDI principally operated a wholesale jewelry business.

8.     Debtor Fantasy, Inc. ("**Fantasy**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Fantasy principally operated a wholesale jewelry business. FDI owns 100% of the equity interests in Fantasy.

9.     Debtor Old AJ, Inc. (formerly known as A. Jaffe, Inc., formerly known as Sandberg & Sikorski Corp.) ("**Jaffe**") is a privately-held New York corporation, with its principal place of business in New York. While in operation, Jaffe was principally a wholesale bridal jewelry business.

10.     Plaintiff Richard Levin is the chapter 11 trustee for the Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for Region 2 on June

2

14, 2018, whose appointment was approved by this Court by order entered that same day. The Trustee brings this action, not individually, but solely in his capacity as Trustee.

**B.**    *The U.S. Affiliates*

11.    Firestar Group, Inc. ("**FGI**"), a Delaware corporation, is a holding company that owns approximately 95% of the equity interests in FDI. Samuel Sandberg owns the remaining approximately 5% of FDI.

12.    Synergies Corporation ("**Synergies**"), a Delaware corporation, is a holding company that owns approximately 95% of the equity interests in Jaffe and 100% of the equity interests in FGI. Samuel Sandberg owns the remaining approximately 5% of Jaffe.

13.    Firestar Diamond International, Inc. ("**FDII**"), a Delaware corporation, operated primarily as a loose diamond trading business.

14.    Nirav Modi, Inc. ("**NMI**"), a Delaware corporation, operated *Nirav Modi*-branded retail boutiques in New York, Los Angeles, Las Vegas, and Honolulu.

15.    The U.S. Affiliates have not filed for bankruptcy.

16.    On January 15, 2020, the Trustee and the U.S. Affiliates entered into a settlement agreement under which the U.S. Affiliates assigned to the Trustee any and all claims or causes of action then-owned or subsequently acquired by the U.S. Affiliates and consented to entry of a judgment jointly and severally against the U.S. Affiliates and in favor of the Trustee in the amount of $23,116,505.44. (*See* No. 18-10509, Dkt. 1366.) Judgment in that amount was entered on February 18, 2020. (*See* Adv. Proc. 20-01014, Dkt. 3.)

**C.**    *The LOU Entities*

17.    Defendant Diamonds 'R' Us ("**DRUS**") is an Indian partnership formed by Nirav Modi, his uncle Mehul Choksi, and Nirav Modi's business partner Hemant Bhatt, who along with Nirav Modi has been charged by Indian authorities for his actions in support of the Bank Fraud

(as defined below). Upon information and belief and as described below, Nirav Modi and his co-conspirators used DRUS for the principal, if not sole, purpose of fraudulently obtaining letters of undertaking ("**LOUs**") and other forms of credit from Indian banks, including Punjab National Bank ("**PNB**"), to the ultimate detriment of the U.S. Entities.

18.     Defendant Solar Exports ("**Solar**") is an Indian partnership formed by the Modi Family Trust and the Nirav Family Trust. Nirav Modi and his co-conspirators used Solar for the principal, if not sole, purpose of fraudulently obtaining LOUs and other forms of credit from Indian banks, including PNB, to the ultimate detriment of the U.S. Entities.

19.     Defendant Stellar Diamonds ("**Stellar**" and, collectively with DRUS and Solar, the "**LOU Entities**") is an Indian partnership formed by the Modi Family Trust and the Nirav Family Trust. Nirav Modi and his co-conspirators used Stellar for the principal, if not sole, purpose of fraudulently obtaining LOUs and other forms of credit from Indian banks, including PNB, to the ultimate detriment of the U.S. Entities.

**D.     The Debtors' Foreign Affiliates**

20.     Defendant Firestar Diamond BVBA ("**Firestar BVBA**"), a Belgian company, operated as a rough diamond trading and manufacturing business.

21.     Defendant Firestar Diamond International Limited (formerly known as Firestar Diamond International Private Limited) ("**FDIPL**"), an Indian company, operated factories in India.

22.     Defendant Firestar Diamond Limited ("**FDL**"), a Hong Kong company, operated as a polished diamond trading business analogous to FDII.

23.     Defendant Nirav Modi Ltd. ("**NML**"), a Hong Kong company, is the principal holding company for subsidiaries operating *Nirav Modi*-branded boutiques around the globe.

4

24.      Defendant Firestar Holdings Limited ("**FHL**"), a Hong Kong company, is a holding company that owns 100% of the equity interests in Synergies, FDII, NML, Firestar BVBA, FDL, and other overseas Firestar entities.

25.      Defendant Firestar International Limited (formerly known as Firestar International Private Limited) ("**FIL**" and, collectively with Firestar BVBA, FDL, FDIPL, FHL, and NML, the "**Foreign Affiliates**"), an India company, holds 100% of the equity interests in FHL and FDIPL and is the ultimate holding company of the U.S. Entities and other overseas Firestar entities, including, but not limited to, the Foreign Affiliates (collectively, the "**Firestar Entities**").

## BACKGROUND

26.      Nirav Modi entered the diamond business around 2000 under the name Diamonds 'R' Us, an India partnership formed by Modi, Modi's uncle Mehul Choksi, and Modi's business partner Hemant Bhatt.

27.      In 2004, Nirav Modi founded FIL, which operated as a diamond trading business in India and the parent of the global Firestar corporate umbrella. Nirav Modi has at all relevant times been the owner of substantially all of the equity interests in FIL.

28.      In 2006, Nirav Modi formed India-based FDIPL as a wholly owned subsidiary of FIL. FDIPL operated diamond and jewelry manufacturing operations from factories in India. FDIPL manufactured a substantial portion of the inventory sold by other Firestar Entities.

29.      Over time, Nirav Modi expanded the Firestar Entities' operations to the U.S., Hong Kong, Dubai, and Europe. Nirav Modi, acting through FIL and its subsidiaries, acquired the company that became FDI (then known as Firestone, Inc.) in 2005, acquired a 95% interest in Jaffe (then known as Sandberg & Sikorski Corp.) from Samuel Sandberg and Stanley Sikorski in 2007, and incorporated Fantasy in 2012. In connection with Nirav Modi's indirect acquisition of Jaffe, Samuel Sandberg received an equity interest in FDI.

5

30.     The U.S. Entities' operations were managed and controlled by Nirav Modi's cousin, Mihir Bhansali. At all relevant times, Mihir Bhansali served as the sole director and Chief Executive Officer of FDI and Fantasy, and as the sole director and President of Jaffe. Bhansali also served as the sole director of each U.S. Affiliate, as well as the Chief Executive Officer of Synergies, FGI, and NMI. Bhansali also served as a director of FIL. In the context of both the Firestar Entities' legitimate operations and the fraudulent schemes described below, Mihir Bhansali served as Nirav Modi's second-in-command.

31.     Mihir Bhansali's own top lieutenant, Ajay Gandhi, served as the Chief Financial Officer of each of the Debtors and U.S. Affiliates for the entirety of the Relevant Period with the exception of a brief 3-month departure in 2013. As alleged below, Mihir Bhansali and Ajay Gandhi managed the fraudulent aspects of Nirav Modi's U.S. operations.

32.     The Hong Kong-based Firestar Entities included Defendants FHL and NML. FHL, a wholly owned subsidiary of FIL, had no operations of its own and instead acted as the primary holding company for the Hong Kong, Dubai, Europe, and eventually U.S.-based Firestar Entities.

33.     FDL, a wholly owned subsidiary of FHL, operated in Hong Kong as a polished diamond trading business analogous to FDII in New York. FDL was managed by Aditya Nanavati, the Head of Asia-Pacific in the global Firestar umbrella. Shyam Wadhwa, FIL's vice president of finance, served as the *de facto* chief financial officer of the Hong Kong-based Firestar Entities, including FDL.

34.     NML, a wholly owned subsidiary of FHL, is the principal holding company for subsidiaries operating *Nirav Modi*-branded boutiques around the globe, including New York-based NMI (which operated the U.S. boutiques) and UK-based Nirav Modi Ltd. (which operated the London boutique).

35.      Firestar BVBA, a Belgian company, operated as a rough diamond trading and manufacturing business. Firestar BVBA was managed by Nirav Modi's youngest brother, Neeshal Modi, in Antwerp, Belgium. Neeshal Modi was also involved with Firestar Entities operating in Dubai. Throughout the Relevant Period, Firestar BVBA traded extensively with entities in Hong Kong and Dubai in furtherance of the fraudulent scheme alleged below.

**A.      The Mechanics of the Bank Fraud**

36.      From no later than 2010 to early 2018, Nirav Modi orchestrated and directed a scheme to obtain loans, credits, or other funds under false pretenses and without collateral from numerous banks, including Punjab National Bank, a publicly-owned Indian bank majority owned by the central government of India (as set forth in more detail below, the "**Bank Fraud**").

37.      The Bank Fraud involved the fraudulent procurement of buyer's credit issued under letters of undertaking, a financial instrument unique to India designed to facilitate efficient import transactions.

38.      When used legitimately, LOUs allow an importer to forego the expense an importer would otherwise incur by borrowing Indian currency and then converting it to a foreign currency to pay foreign suppliers. Instead, the importer obtains short-term credit from its bank in India, secured by invoices for the to-be imported goods. The issuing bank, in turn, enters into the foreign currency transaction: it requests a foreign branch of another Indian bank to transmit funds into the issuing bank's own account (referred to as its nostro—"our"—account) at the foreign branch of a third bank to pay the exporter in its local currency. The issuing bank then repays the intermediary bank and recoups the loan from the importer (or the imported goods serving as its collateral).

39.      Since each LOU requires an import transaction, an importer's LOU borrowing capacity is tied directly to its import volume—the more imports, the more LOU funding available.

40.     Nirav Modi and his co-conspirators conspired to take advantage of this feature by artificially inflating the import volume of Nirav Modi's companies—most notably DRUS, Solar, and Stellar—with sham transactions so as to obtain more and more LOU funding.

41.     PNB and other banks advanced amounts equal to over $1 billion under LOUs for the benefit of entities under Nirav Modi's control in connection with imports to India without the ordinarily-required collateral.

42.     To carry out this scheme, Nirav Modi and his co-conspirators utilized a web of shadow entities to engage in fraudulent and fictitious import transactions, including: Auragem Company Ltd. ("**Auragem**"), Brilliant Diamonds Ltd. ("**Brilliant**"), Diagems FZC ("**Diagems**"), DG Brothers FZE ("**DG Brothers**") Empire Gems FZE ("**Empire**"), Eternal Diamonds Corporation Ltd. ("**Eternal**"), Fancy Creations Company Ltd. ("**Fancy**"), Himalayan Traders FZE ("**Himalayan**"), Pacific Diamonds FZE ("**Pacific**"), Sino Traders Ltd. ("**Sino**"), Sunshine Gems Ltd. ("**Sunshine**"), Tri Color Gems FZE ("**Tri Color**"), Unique Diamond and Jewellery FZC ("**Unique**"), Unity Trading, FZE ("**Unity**"), Universal Fine Jewelry FZE ("**Universal**"), Vista Jewelry FZE ("**Vista**"), and World Diamond Distribution FZE  ("**World Diamond**", collectively, the "**Shadow Entities**," and together with the Firestar Entities, LOU Entities, and all other entities controlled by Nirav Modi and his family members, the "**Modi-Controlled Entities**").

43.     Though designed to look like legitimate independent businesses, the Shadow Entities were no more than shell companies controlled by Nirav Modi and his co-conspirators. They conducted virtually no legitimate business, but instead existed only to further the Bank Fraud by conducting bogus transactions with the Modi-Controlled Entities and laundering the ill-gotten proceeds.

44.     The two primary clusters of Shadow Entities operated from Hong Kong and Dubai. The Hong Kong-based Shadow Entities included Auragem, Brilliant, Eternal, Fancy

8

Creations, Sino, and Sunshine. The Dubai-based Shadow Entities included Unique, World Diamond, Vista, Empire, Universal, Diagems, Tri Color, Pacific, Himalayan, and Unity.

45.     The Shadow Entities were mostly registered at either small, unoccupied offices or at single, leased desks within shared offices. They had almost identical websites with similar backgrounds, fonts, contact pages, and language.

46.     Mihir Bhansali maintained a spreadsheet tracking the operational status of the Dubai-based Shadow Entities.

47.     The LOU Entities and Shadow Entities traded exclusively or nearly exclusively with other Modi-Controlled Entities. The following table reflects the extent to which the LOU Entities traded exclusively with Shadow Entities and Firestar Entities:

| LOU Entity | Fiscal Year 2012 - 2017 | | | | | |
|---|---|---|---|---|---|---|
| | Sales to Listed Modi-Controlled Entities as % of Gross Sales | | | Purchases from Listed Modi-Controlled Entities as % of Total Costs of Goods Sold | | |
| | *Shadow Entities* | *Firestar Entities* | *Total* | *Shadow Entities* | *Firestar Entities* | *Total* |
| DRUS | 88.4% | 7.5% | 95.9% | 99.7% | 0.4% | 100.1% |
| Stellar | 98.7% | 0.5% | 99.2% | 100.1% | 0.3% | 100.3% |
| Solar | 98.9% | 0.7% | 99.6% | 99.9% | 0.1% | 100.0% |

48.     From around 2013 onward, Nirav Modi and his co-conspirators used the Shadow Entities as an intermediary between the LOU Entities and Firestar Entities. PNB and other banks were aware of Nirav Modi's affiliation with the LOU Entities and the Firestar Entities, but his affiliation with the Shadow Entities was hidden from the banks.

49.     The Shadow Entity import and export transactions purported to involve arm's-length sales of highly valuable loose diamonds, pearls, gold, silver, and other jewelry. In truth, these transactions had no legitimate economic purpose and routinely involved goods that: (a) did not exist; (b) were never transferred; (c) were transferred at prices having nothing to do with market value, but instead based on whatever amounts were necessary to reconcile the Shadow

Entities' and Firestar Entities' books and records so as to conceal other transfers made for illegitimate purposes; or (d) were transferred in "circular transactions," in which the same goods were exported from and re-imported among Modi-Controlled Entities multiple times at varying and often inflated prices to give the appearance of multiple distinct transactions for the sole purpose of artificially increasing the entities' import volume.

50.    According to statements made by various Firestar Entity and Shadow Entity employees to Indian authorities:

a. FIL, FDIPL, and other India-based Firestar Entities would export jewelry to Shadow Entities in Dubai and Hong Kong, where, at least in some instances, the diamonds would be removed and then subsequently re-exported for further import and the precious metals melted.

b. None of the jewelry exported from India to the Shadow Entities was ever returned as defective, substandard, or otherwise noncompliant, as would be expected in the course of an arm's length vendor-customer relationship.

c. Orders placed by Shadow Entities frequently lacked the formality, exactness, and diligence that ordinarily would be expected of transactions with a bona fide third party. For example, V. Suresh Ramnath Naidu, a director of Diagems, told Indian authorities that he signed blank invoices, but that he never actually saw any of the diamonds or jewelry.

51.    Modi-Controlled Entities also obtained additional funding through packing credit loans, which are short-term working capital loans obtained by vendors to fulfill upcoming orders of goods. In the context of the Bank Fraud, the India-based Modi-Controlled Entities would obtain packing credit loans on the basis of purported orders from other Modi-Controlled Entities overseas. However, packing credit loan proceeds were frequently diverted for other purposes, including the repayment of outstanding LOUs.

52.     Many of the Shadow Entities' directors were current or former employees of Firestar Entities. In addition, many Shadow Entity employees were current or former employees of Firestar Entities.

53.     The transactions between and among Firestar Entities, LOU Entities, and Shadow Entities furthered the Bank Fraud by: (a) inflating the Indian entities' LOU borrowing capacity by artificially inflating their import volumes for LOUs and export volume for packing credit loans; (b) facilitating the repayment of some but not all outstanding LOUs and packing credit loans; (c) laundering the fraudulent proceeds by making them difficult to trace and siphoning them to Nirav Modi and his co-conspirators; and (d) making it difficult for auditors, lenders, and regulatory bodies to detect the Bank Fraud.

54.     Transfers for these purposes were concealed in various ways, including: (a) round trip transactions of gems, jewelry, or funds in which Modi-Controlled Entities transferred assets among themselves without any legitimate economic purpose; (b) buying and selling gems at inflated or deflated prices; (c) characterizing transfers as loans or loan repayments or advances against future purchases or returns of such advances; and (d) in some instances, fraudulently doctoring books and records outright.

55.     To facilitate the continuing flow of LOUs and to prevent detection, Nirav Modi and others at his direction, including Manish Bosamiya, Subhash Parab, and Miten Pandya, worked with certain PNB employees, including Gokulnath Shetty, who authorized LOUs without securing collateral and without properly recording the LOUs in PNB's records.

56.     According to a forensic report issued by BDO in December 2019, PNB issued over 1,500 fraudulent LOUs to Modi-Controlled Entities during the Relevant Period involving approximately $3.5 billion.

*B.*      *Detection and Exposure of the Bank Fraud*

57.      In late May 2017, Golkunath Shetty, the PNB employee who approved fraudulent LOUs for the benefit of Nirav Modi's companies, retired. In the months leading up to his retirement, between February and May 2017, Shetty approved nearly 150 new LOUs totaling over $1 billion to the LOU Entities. These LOUs became due on or around January 25, 2018.

58.      According to Indian authorities, Nirav Modi and his brother Neeshal Modi fled India on January 1, 2018, and Mehul Choksi did so on January 4, 2018.

59.      On January 5, 2018, Nirav Modi purchased a London apartment for £7,950,000 in cash under the name "Richard Beattie" which appears to be an alias or surrogate of Nirav Modi. Nirav Modi was living in this apartment when he was arrested in March 2019. It was also the registered office of Diamond Holdings Ltd., a UK company Nirav Modi formed in May 2018.

60.      On or around January 20, 2018, a representative of one of the LOU Entities asked PNB to roll-over the 2017 LOU balances into new LOUs. On January 22, 2018, PNB refused to issue new LOUs without a 100% cash margin deposit, among other requirements. The Modi representative refused to furnish any margin on the grounds that PNB had never before required a margin to issue an LOU. PNB immediately began investigating the borrowing practices of the Modi-Controlled Entities.

61.      The Bank Fraud has resulted in several investigations and criminal enforcement actions against Nirav Modi, Mihir Bhansali, and others by Indian governmental authorities, including the Central Bureau of Investigation ("**CBI**"); the Directorate of Enforcement ("**ED**"); the Income Tax Department; and the Serious Fraud Investigation Office.

62.      On January 29, 2018, PNB lodged a criminal complaint against Nirav Modi with India's CBI. On February 13, 2018, PNB lodged a complaint against Nirav Modi with India's ED,

which subsequently attached various movable and immovable properties belonging to Nirav Modi and various Modi-Controlled Entities.

63.    On July 3, 2018, PNB filed Application No. 119/2018 in the Debts Recovery Tribunal No. I at Mumbai (the "**Indian Debt Tribunal**") against Nirav Modi and certain of his family members, each LOU Entity, FIL, and FDIPL.

64.    In early 2019, Nirav Modi was found living in London under the alias "Edmond Dantes."

65.    On or about March 12, 2019, the Indian government issued an extradition request to the government of the United Kingdom on the basis of an arrest warrant issued against Nirav Modi by an Indian court. Modi was arrested in London on or about March 20, 2019 and is currently incarcerated in London.

66.    On July 6, 2019, the presiding officer of the Indian Debt Tribunal issued a judgment against Nirav Modi, the LOU Entities, FIL, and others based on the following factual findings, among others (capitalized terms in original):

a.    Nirav Modi has floated Overseas Companies in Hong Kong and U.A.E. which are dummy/shell Companies. The Directors and share-holders of these Companies are either ex-employees or employees acting under instructions of Nirav Modi.

b.    The Overseas Companies and Hong Kong and Dubai deals with the Firestar Group directly or indirectly owned by Nirav Modi who has full control over these Companies through the dummy Directors. The Enforcement Directorate in its Complaint has recorded that the list of top 8 borrowers and top 8 suppliers are none else but the ex-employees of Firestar Group and acting and implementing the instructions given by Nirav Modi and Mihir Bhansali.

c.    The fraud has been perpetrated by Nirav Modi in collusion, connivance and with the aid and assistance of the group companies i.e. Firestar International Limited and Firestar Diamond International Pvt. Ltd. along with their affiliates, subsidiaries, Nirav Family Trust, Nirav Modi Family Trust, directors and key managerial personnel.

d.    The investigation conducted by the Enforcement Directorate further reveals that the dummy Companies were set up in Hong Kong and Dubai along with

the regular Firestar Group Companies [and] acted as nodes for circular transactions to layer and launder money generated by the fraudulent LOUs.

e.  [Nirav Modi and his family members] are the mastermind[s] behind the perpetration of the fraud. Defendants have laid a complex structure or façade involving several layers of partnership Firms, companies and trusts for the purposes of perpetrating fraud and to isolate themselves from the liability that has arisen from unauthorized LOUs.

f.  All of the aforesaid dates and events reveal the systematic fraud was perpetrated by Nirav Modi and moving the US Court for insolvency to avoid the liability. Nirav Modi and his accomplishes [sic] have taken prompt steps before the US Court to avoid the seizer [sic] and attachment of the properties purchased and acquired by Nirav Modi from the proceeds of the fraudulent debt.

67.    The Bank Fraud resulted in a total loss to PNB and other banks in excess of $1 billion. As a result of the Bank Fraud, PNB has asserted claims against each of the Debtors in excess of $1 billion on the grounds, among others, that a substantial portion of the proceeds of the Bank Fraud were transferred to or through the Debtors. In addition, the Bank Fraud and its exposure and the seizure by Indian authorities of Modi-Controlled Entities in India resulted in the collapse of the Debtors' businesses and the filing of these chapter 11 cases.

*C.    The U.S. Entities' Role in the Bank Fraud*

68.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi, and other co-conspirators funneled millions of dollars in funds, precious gems, and jewelry through the U.S. Entities and their offices in furtherance of the Bank Fraud, both in circular transactions with Shadow Entities and other Modi-Controlled Entities to propagate the Bank Fraud and in noncircular transactions designed to launder the proceeds of the Bank Fraud for the benefit of the Nirav Modi, Mihir Bhansali, their families, and other co-conspirators.

69.    In the early stages of the Bank Fraud scheme, from around 2010 to 2012 when the LOU Entities were still trading directly with Firestar Entities, the U.S. Entities were directly involved in import and export transactions underlying fraudulently procured LOUs. For

example, in 2011, FDI and Jaffe were the exporters and direct beneficiaries of five LOUs and one LOU, respectively, totaling $10,192,303.

70.    As an example of the U.S. Entities' involvement in circular transactions, from August 8, 2011 to September 13, 2011, a period of five weeks, the Debtors exported the same 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond three times and imported it once to and from various LOU Entities and Shadow Entities at widely divergent prices.

71.    Later in 2011, the Debtors engaged in another circular trading of a diamond that was recorded as a 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond. The diamond appeared in the Debtors' records in three transactions within six weeks of each other and was valued at a different price each time.

72.    From around 2013 onward, the Shadow Entities were used as an intermediary between the Firestar Entities and LOU Entities. PNB and other banks were aware of Nirav Modi's affiliation with the Firestar Entities and LOU Entities, but his affiliation with the Shadow Entities was hidden from them.

73.    During this period, the U.S. Entities made numerous transfers to Shadow Entities linked to the repayment of outstanding LOUs so that the Bank Fraud could continue undisturbed.

74.    For example, on September 24, 2015, FDI transferred $1,840,969 to Auragem and $1,400,000 to Fancy Creations. A portion of these funds was used to repay an LOU issued to DRUS that became due on September 30, 2015.

75.    As another example, on February 26, 2016, FDI transferred $1,192,106 to Tri Color. On March 9, 2016, Tri Color transferred $1,647,000 to Solar. That same day, Solar transferred $2,087,000 to repay an LOU that became due on March 11, 2016.

76.    Consistent with these examples and others alleged herein, the U.S. Entities' Shadow Entity-linked transactions from 2013 onwards were effectuated for secondary purposes

related the Bank Fraud including to: (a) facilitate repayment of LOUs and packing credit loans so that the Bank Fraud could continue undisturbed; (b) provide Shadow Entities with the goods and funds the Shadow Entities needed to transact with the LOU Entities; (c) clear the Shadow Entities', Firestar Entities', and LOU Entities' accounts receivable and accounts payable so as to avert questions from auditors, lenders, and other third parties; and (d) divert the proceeds of the Bank Fraud for the benefit of Nirav Modi, Mihir Bhansali, their families and other co-conspirators.

77.     The U.S. Entities' records reflect hundreds of millions of dollars in cash transfers and inventory shipments among the U.S. Entities and Shadow Entities during the Relevant Period.

### D.     The LOU Entities' Role in the Bank Fraud

78.     As discussed above, at the heart of the Bank Fraud were sham transactions executed to fraudulently obtain LOU funding. The Firestar Entities were on one end of the transactions and the LOU Entities, also under Nirav Modi's control, served as counter-parties. Upon information and belief, as the Bank Fraud grew larger and more complex and after PNB became aware of Nirav Modi's connection to the LOU Entities, Nirav Modi began using Shadow Entities as intermediaries in the sham transactions to evade detection.

79.     To gain access to LOU funding, the LOU Entities maintained accounts at PNB. In 1998, DRUS opened an account ending in 6123 at PNB's Brady House branch and maintained another account ending in 7161. In 2010, Nirav Modi's wife, his secretary, and his business partner (Hemant Bhatt) opened a Solar account at PNB ending in 3609 and a Stellar account at PNB ending in 3593. A number of individuals unconnected to the jewelry industry were named as partners in the LOU Entities over the years and given signatory authority over the LOU Entities' PNB accounts to further obscure Nirav Modi's involvement in the sham transactions.

80.     The LOU Entities did not meet the requirements for LOU eligibility. To obtain legitimate LOUs, the LOU Entities were required to furnish 100% cash as collateral to secure the repayment obligation to PNB for its repayment of the overseas receiving banks that extended credit based on the LOUs. Instead, Nirav Modi and the LOU Entities conspired with two accomplices at PNB who issued the LOUs without the necessary collateral and papered the sham transactions with false records.

81.     From 2011 to 2018, the LOU Entities fraudulently obtained at least 1,208 LOUs using sham transactions. Six LOUs involved transactions directly between an LOU Entity and a Firestar Entity; the rest involved transactions with Shadow Entities acting as intermediaries. In later years, new LOUs were issued to pay old ones effectively extending the funds available under the LOUs indefinitely. Altogether, upon information and belief, PNB issued approximately $4 billion worth of fraudulently obtained LOUs with over $1 billion of those LOUs outstanding as of the date the Debtors' chapter 11 cases commenced.

82.     Over the Relevant Period, the Debtors funded the LOU Entities with periodic cash transfers, which, upon information and belief, were used to pay off old LOUs, facilitate obtaining new LOUs, and sustain the Bank Fraud. During the Relevant Period, the Debtors made at least 14 cash transfers to the LOU Entities totaling at least $13,785,310. Upon information and belief, during the Relevant Period, the Debtors also transferred valuable loose diamonds and other inventory to the LOU Entities.

83.     Any transaction involving an LOU Entity necessarily was a transaction actually intended to perpetuate the Bank Fraud, as the LOU Entities' principal, if not sole, purpose was to execute sham transactions and obtain LOUs. As a result, the Debtors, acting through Nirav Modi, Mihir Bhansali, and/or Ajay Gandhi, approved transfers from the Debtors to the LOU Entities in

order to further the Bank Fraud and with the actual intent to hinder, delay, or defraud the Debtors' creditors.

**E.      The Trustee's Claims Against the LOU Entities**

84.      The Trustee has identified at least $4,833,875 in transfers from the Debtors to or for the benefit of DRUS dating back to January 1, 2011, that were made with actual intent to hinder, delay, or defraud then-present or future creditors and which can be avoided as actual fraudulent transfers under New York law, made applicable by section 544(b) of the Bankruptcy Code. These transfers are set out in the attached Schedule A.

85.      The Trustee has identified at least $7,714,175 in transfers from the Debtors to or for the benefit of Solar dating back to January 1, 2011, that were made with actual intent to hinder, delay, or defraud then-present or future creditors and which can be avoided as actual fraudulent transfers under New York law, made applicable by section 544(b) of the Bankruptcy Code. These transfers are set out in the attached Schedule B.

86.      The Trustee identified at least $1,237,260 in transfers from the Debtors to or for the benefit of Stellar dating back to January 1, 2011, that were made with actual intent to hinder, delay, or defraud then-present or future creditors and which can be avoided as actual fraudulent transfers under New York law, made applicable by section 544(b) of the Bankruptcy Code. These transfers are set out in the attached Schedule C.

87.      In total, the Trustee is entitled to recover at least $13,785,310 in fraudulent transfers that were made by the Debtors with actual fraudulent intent to or for the benefit of the LOU Entities.

88.      Upon information and belief, the Debtors likely made additional actual fraudulent transfers to the LOU Entities that have not been identified to date and included on the attached Schedules because of the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-

18

conspirators to conceal the existence and extent of the Bank Fraud. The Trustee reserves all rights

to identify and avoid additional actual fraudulent transfers that are identified in the course of the

Trustee's ongoing investigation.

**F.     The Foreign Affiliates' Role in the Bank Fraud**

89.     As part of the Firestar corporate family, the Foreign Affiliates' involvement in the

Bank Fraud was extensive. From 2011 to 2018, millions of dollars in cash and loose diamonds and

other inventory flowed from the U.S. Entities to the Foreign Affiliates. Some of those transfers

were for the Foreign Affiliates' role in the legitimate business operations of the Firestar Entities.

None of those legitimate transactions are at issue in this Complaint.

90.     However, other transfers between the U.S. Entities and the Foreign Affiliates were

made in furtherance of the Bank Fraud and with actual intent to hinder, delay, or defraud then-

present and future creditors. Often, the transfer from a U.S. Entity to a Foreign Affiliate was just

one step in a larger transaction involving Shadow Entities or LOU Entities to fraudulently obtain

LOU funding, and to sustain the Bank Fraud. For example:

a. On May 6, 2011, FDI received $1,858,219 in LOU funding on account of a sham transaction between Solar and FDI. That same day, FDI made seven transfers to Foreign Affiliates FIL and FDIPL, totaling $1,856,673.

b. On October 13, 2011, Jaffe received $1,921,079 in LOU funding on account of a sham transaction between DRUS and Jaffe. That same day, Jaffe made four transfers to Foreign Affiliate FIL totaling $1,890,694.

c. On March 27, 2012, Jaffe received $3,009,489 from Shadow Entity Empire. That same day, Jaffe made five transfers to FIL totaling $3,006,450.

d. On October 29, 2012, FDII received $1,067,120 from Shadow Entity Empire. Three days later, on November 2, 2012, FDII transferred $1,068,306 to FDI. That same day, FDI transferred $806,131 to FIL and $262,175 to FDIPL, totaling $1,068,310.

e. On November 7, 2012, FDII received $1,978,902.57 from Shadow Entity Fancy Creations. That same day, FDII transferred $1,978,920 to FDI, which immediately transferred that amount to Jaffe. That same day, Jaffe made two transfers to FIL of $1,019,440 and $959,480, totaling $1,978,920.

f.  On September 18, 2014, Manish Bosamiya emailed Ajay Gandhi, copying Bhavesh Patel, "Firestar Diamond Intl Inc will receive US $550,000.00 from Firestar Diamond Ltd (HK) in Capital One Bank." Patel then emailed Gandhi, "Please approve below wire from Capital Old [one of FDII's Capital One bank accounts] to [Shadow Entity] Pacific for $550,000.00 as POA."

g.  On September 24, 2015, FDI borrowed $1,500,000 from HSBC Bank. That same day, FDI received $1,414,865 from FDIPL. That same day, FDI transferred $1,840,969 to Shadow Entity Auragem, $1,400,000 to Shadow Entity Fancy Creations, and $210,128 to FIPL. Upon information and belief, on September 28, 2015, Auragem transferred INR 2.88 Cr (worth approximately $473,000) to DRUS, and on September 29, 2015, DRUS transferred $1,505,000 to Hong Kong-based UCO Bank, which served as the correspondent bank for a fraudulent LOU dated October 9, 2014 that DRUS obtained from PNB in the amount of $1,479,000 for which Auragem was an exporter.

h.  On April 6, 2016, Firestar BVBA "sold" 1,017.14 carats of diamonds to FDI that it promptly "repurchased" in full on April 13, 2016. The two entities kept the associated receivables open for several months. On June 9, 2016, Firestar BVBA paid FDI for its "repurchase," whereupon FDI sent back the same funds, purportedly to repay another invoice. On August 29, 2016, the Firestar affiliate Firestar Diamond FZE received funds from Eternal (a Shadow Entity) and routed them through FDI, which used the funds to clear the Firestar BVBA payable associated with the "sale." A similar transaction occurred on November 27, 2012, when Firestar BVBA "sold" 661.29 carats of diamonds to FDI, and which it promptly "repurchased" in full on December 14, 2012.

i.  On April 24, 2014, FDII received $684,498 from Shadow Entity Pacific. On April 28, 2014, FDII transferred $684,000 to FDI, which immediately made three transfers to FIL totaling $232,179 and two transfers to FDIPL totaling $469,365. In the aggregate, FIL and FDIPL received $701,544 from FDI.

j.  On September 8, 2016, FDII received $1,981,659 from Shadow Entity World Diamond. That same day, FDII transferred $1,980,000 to Jaffe. That same day, Jaffe transferred $1,906,920 to FIL.

k.  On September 12, 2016, FDII received $1,121,247 from Shadow Entity World Diamond. The next day, on September 13, 2016, FDII transferred $1,185,000 to Jaffe. That same day, Jaffe transferred $1,185,687 to FIL.

l.  On April 3, 2017, an India-based consultant emailed Mihir Bhansali a spreadsheet summarizing sales from various foreign Firestar Entities, including FIL and FDIPL, to Dubai-based Shadow Entities, including World Diamond, Universal, Empire, Vista, Unique, and Diagems. The spreadsheet reflected a total of $770,730,000 in sales of rough stones, polished stones, and jewelry by various foreign Firestar Entities to these six Shadow Entities during fiscal year 2015 to 2016, and a total of $454,910,000 in such sales from April 2016 to February 2017.

m.  On February 6, 2018, FDI wired $1,002,836.77 to FIL. That same day, Jaffe wired $505,610.51 to FIL and Fantasy wired $401,471.08 to FIL. That same day,

20

Subhash Parab emailed Ajay Gandhi, copying Shyam Wadhwa, "Please pay following bills to FIPL . . . We have some urgent re-payment from IDBI bank for that [sic] we require below bills in IDBI bank[.]" The email contained a list of amounts owed by FDI and Fantasy totaling $1,002,836.77 and $401,471.08, respectively. Gandhi replied, "I can pay $500k from Jaffe to [sic]. Please email list as needed for Jaffe." Parab replied with a list of amounts owed by Jaffe totaling $505,610.51. Gandhi replied, "Funds wired."

n.   Between October 20, 2011 and March 11, 2012, Nirav Modi personally transferred a total of $14,575,000 to Synergies, which Synergies used to pay off purported loans from FIL. The "loans" from FIL consisted of earlier circular transactions in which FIL wired funds to Synergies and Synergies immediately wired the funds back to FIL, or in on other instances, to FDIPL, Shadow Entity Brilliant, Shadow Entity Eternal, or other Modi-Controlled Entities.

91.     In the weeks leading up to and following exposure of the Bank Fraud, Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators shifted their focus to shielding assets from creditors. As part of this effort, Nirav Modi, Mihir, Ajay Gandhi, and other co-conspirators diverted substantial amounts of the U.S. Entities' cash and inventory to Foreign Affiliates so that then-present and future creditors, including the Debtors, could not reach them.

a.   On January 4, 2018, NMI shipped two packages of inventory, with declared values of $585,000 and $65,000, respectively, through Malca Amit to NML in Hong Kong.

b.   On January 5, 2018, FDII shipped inventory having a declared value of $167,810.65 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

c.   On January 10, 2018, NMI shipped inventory with declared value of $108,550 through Malca Amit to NML in Hong Kong.

d.   On January 10, 2018, FDII shipped inventory having a declared value of $239,871.29 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

e.   On January 11, 2018, NMI shipped inventory with declared value of $32,370, through Malca Amit to NML in Hong Kong.

f.   On January 15, 2018, FDII shipped inventory having a declared value of $781,882.38 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

g.   On January 16, 2018, NMI shipped inventory with declared value of $943,800 through Malca Amit to NML in Hong Kong.

h.   On January 19, 2018, NMI shipped three packages of inventory, with declared values of $273,000, $409,500, and $771,680, respectively, through Malca Amit to NML in Hong Kong.

  i. On January 24, 2018, NMI shipped inventory with a declared value of $1,075,200 through Malca Amit to FDIPL in India.

  j. On January 26, 2018, NMI shipped inventory with a declared value of $198,750 through Malca Amit to NML in Hong Kong.

  k. On January 26, 2018, FDI shipped inventory having a declared value of $85,150 to NML in Hong Kong.

  l. On January 29, 2018, NMI shipped inventory with a declared value of $75,050 through Malca Amit to NML in Hong Kong.

  m. On January 30, 2018, FDII shipped inventory having a declared value of $570,104.37 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

  n. On January 31, 2018, NMI shipped inventory with a declared value of $660,500 through Malca Amit to NML in Hong Kong.

  o. On February 13, 2018, NMI shipped inventory with a declared value of $154,440 through Malca Amit to NML in Hong Kong.

  p. On March 6, 2018, FDII shipped inventory with a declared value of $4,325,472.34 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

  q. On April 25, 2018, 45 pieces of NMI inventory, having a total declared value of $6,315,615, were shipped via Malca Amit to NML in Hong Kong. Ajay Gandhi signed the packing lists included in the shipping instructions.

  r. On April 26, 2018, 93 pieces of NMI inventory, having a total declared value of $13,108,072, were shipped via Malca Amit to NML in Hong Kong. Ajay Gandhi signed the packing list included in the shipping instructions.

  s. On May 15, 2018, 122 pieces of NMI inventory having a declared value of $2,516,470.79 were shipped to NML in Hong Kong through Malca Amit. Ajay Gandhi signed the packing list included in the shipping instructions.

  t. On May 23, 2018, NML "sold" the 122 pieces of NMI inventory to FDL. That same day, FDL "sold" the same pieces to Shadow Entity Sino Traders. Anthony Allicock (a retail store manager who was appointed the sole director of FHL, NML, and FDL on March 19, 2018) signed the invoices for both of these purported sales. Yet, on June 19, 2018, Allicock told attorneys for the Hong Kong Firestar Entities that the May 15 shipment was sent from New York without Allicock's authorization and asked them to attempt to locate the shipment.

92. In one particularly glaring example of the Foreign Affiliates' involvement in shielding assets from creditors, FHL played a key role in secreting one of Nirav Modi's most valuable assets: a $5 million apartment in New York City that Nirav Modi and his family used as their personal residence.

93.     On August 23, 2017, Purvi Mehta (Nirav Modi's sister) executed a trust agreement creating the Ithaca Trust. The Ithaca Trust agreement named Ami Modi (Nirav Modi's wife) and her children as the trust's beneficiaries.

94.     At the time the Ithaca Trust was created in 2017, FGI owned an entity called Central Park Real Estate LLC ("**CPRE**"). CPRE, in turn, owned an apartment at the Essex House, 160 Central Park South in New York City (the "**Essex House Apartment**"), which CPRE had purchased in 2007 for $4.995 million. To fund the purchase of the Essex House Apartment, CPRE had obtained an approximately $3 million mortgage from HSBC. On information and belief, from the date of its purchase, the Essex House Apartment was used by Nirav Modi and Ami Modi as a personal residence.

95.     On December 4, 2017, by email, Nirav Modi told Ajay Gandhi to pay off the HSBC mortgage on the Essex House Apartment in full. Gandhi contacted HSBC indicating that there was an urgent need for the Ithaca Trust to assume the mortgage on the Essex House Apartment and transfer the liability from FGI to the Ithaca Trust. Gandhi soon determined the mortgage could not be transferred quickly enough and decided instead to arrange to have the mortgage paid off completely.

96.     Over the next several days, Gandhi orchestrated a lengthy series of transactions to pay off the HSBC mortgage on the Essex House Apartment and move the apartment into the Ithaca Trust. Upon information and belief, Gandhi routed the cash to pay off the mortgage through a number of entities, including FHL, to obscure the fact that the funds ultimately came from FDI, even though CPRE (and its parent, FGI) ultimately owed the debt on the HSBC mortgage.

97.    On December 12, 2017, as part of those transactions, FDI wired $1,000,000 from its HSBC account ending in 3004 to FHL's Union Bank of India account ending in 0284, with JPMorgan Chase acting as an intermediary bank.

98.    Upon information and belief, the December 12, 2017 transfer of $1,000,000 from FDI to FHL was essential to carrying out the overarching fraudulent scheme to shield assets from creditors. With the mortgage on the Essex House Apartment retired, Nirav Modi and his co-conspirators transferred the apartment (worth approximately $6 million and now unencumbered by debt) to the Ithaca Trust. The transfer was complete by January 1, 2018.

## G.    The Trustee's Claims Against the Foreign Affiliates

99.    Altogether, the Trustee's investigation has, to date, uncovered $248,556,427 in transfers from the Debtors and the U.S. Affiliates made to Foreign Affiliates that furthered the Bank Fraud or secreted assets, and which were made with actual intent to hinder, delay, or defraud then-present or future creditors of the U.S. Entities.

100.    The Trustee has identified at least $13,532,129 in transfers from the Debtors to or for the benefit of Firestar BVBA dating back to January 1, 2011, that were made with actual intent to hinder, delay, or defraud then-present or future creditors and which can be avoided under New York law, made applicable by section 544(b) of the Bankruptcy Code. Of these transfers, $8,165,595 were made by the Debtors after February 26, 2016 and may be avoided under section 548 of the Bankruptcy Code as well. The actual fraudulent transfers from the Debtors to Firestar BVBA identified to date are included on the attached Schedule D.

101.    The Trustee has identified at least $6,006,663 in transfers from the Debtors to or for the benefit of FDL dating back to January 1, 2011, that were made with actual intent to hinder, delay, or defraud then-present or future creditors and which can be avoided under New York

24

law, made applicable by section 544(b) of the Bankruptcy Code. The actual fraudulent transfers from the Debtors to FDL identified to date are included on the attached Schedule E.

102.    The Trustee has identified at least $74,766,651 in transfers from the Debtors to or for the benefit of FDIPL dating back to January 1, 2011, that were made with actual intent to hinder, delay, or defraud then-present or future creditors and which can be avoided under New York law, made applicable by section 544(b) of the Bankruptcy Code. Of these transfers, $18,489,635 were made by the Debtors after February 26, 2016 and may be avoided under section 548 of the Bankruptcy Code as well. The actual fraudulent transfers from the Debtors to FDIPL identified to date are included on the attached Schedule F.

103.    The Trustee has identified at least $1,000,000 in transfers from the Debtors to or for the benefit of FHL dating back to January 1, 2011, that were made with actual intent to hinder, delay, or defraud then-present or future creditors and which can be avoided under New York law, made applicable by section 544(b) of the Bankruptcy Code. Of these transfers, $1,000,000 were made by the Debtors after February 26, 2016 and may be avoided under section 548 of the Bankruptcy Code as well. The actual fraudulent transfers from the Debtors to FHL identified to date are included on the attached Schedule G.

104.    The Trustee has identified at least $85,150 in transfers from the Debtors to or for the benefit of NML dating back to January 1, 2011, that were made with actual intent to hinder, delay, or defraud then-present or future creditors and which can be avoided under New York law, made applicable by section 544(b) of the Bankruptcy Code. Of these transfers, $85,150 were made by the Debtors after February 26, 2016 and may be avoided under section 548 of the Bankruptcy Code as well. The actual fraudulent transfers from the Debtors to NML identified to date are included on the attached Schedule H.

105.    The Trustee has identified at least $122,054,686 in transfers from the Debtors to or for the benefit of FIL dating back to January 1, 2011, that were made with actual intent to hinder, delay, or defraud then-present or future creditors and which can be avoided under New York law, made applicable by section 544(b) of the Bankruptcy Code. Of these transfers, $13,268,608 were made by the Debtors after February 26, 2016 and may be avoided under section 548 of the Bankruptcy Code as well. The actual fraudulent transfers from the Debtors to FIL identified to date are included on the attached <u>Schedule I</u>.

106.    The Trustee has identified at least $3,205,275 in transfers from the U.S. Affiliates to or for the benefit of Firestar BVBA dating back to January 1, 2011, that were made with actual intent to hinder, delay, or defraud then-present or future creditors and which can be avoided under New York law by the Debtors as judgment creditors of the U.S. Affiliates. The actual fraudulent transfers from the U.S. Affiliates to Firestar BVBA identified to date are included on the attached <u>Schedule J</u>.

107.    The Trustee has identified at least $13,392,904 in transfers from the U.S. Affiliates to or for the benefit of FDL dating back to January 1, 2011, that were made with actual intent to hinder, delay, or defraud then-present or future creditors and which can be avoided under New York law by the Debtors as judgment creditors of the U.S. Affiliates. The actual fraudulent transfers from the U.S. Affiliates to FDL identified to date are included on the attached <u>Schedule K</u>.

108.    The Trustee has identified at least $1,245,882 in transfers from the U.S. Affiliates to or for the benefit of FDIPL dating back to January 1, 2011, that were made with actual intent to hinder, delay, or defraud then-present or future creditors and which can be avoided under New York law by the Debtors as judgment creditors of the U.S. Affiliates. The actual fraudulent

transfers from the U.S. Affiliates to FDIPL identified to date are included on the attached Schedule L.

109.     The Trustee has identified at least $5,858,500 in transfers from the U.S. Affiliates to or for the benefit of FHL dating back to January 1, 2011, that were made with actual intent to hinder, delay, or defraud then-present or future creditors and which can be avoided under New York law by the Debtors as judgment creditors of the U.S. Affiliates. The actual fraudulent transfers from the U.S. Affiliates to FHL identified to date are included on the attached Schedule M.

110.     The Trustee has identified at least $6,633,586 in transfers from the U.S. Affiliates to or for the benefit of NML dating back to January 1, 2011, that were made with actual intent to hinder, delay, or defraud then-present or future creditors and which can be avoided under New York law by the Debtors as judgment creditors of the U.S. Affiliates. The actual fraudulent transfers from the U.S. Affiliates to NML identified to date are included on the attached Schedule N.

111.     The Trustee has identified at least $775,000 in transfers from the U.S. Affiliates to or for the benefit of FIL dating back to January 1, 2011, that were made with actual intent to hinder, delay, or defraud then-present or future creditors and which can be avoided under New York law by the Debtors as judgment creditors of the U.S. Affiliates. The actual fraudulent transfers from the U.S. Affiliates to FIL identified to date are included on the attached Schedule O.

112.     In total, the Trustee is entitled to recover at least $248,556,427 in fraudulent transfers that were made to or for the benefit of the Foreign Affiliates.

113.     Upon information and belief, the U.S. Entities likely made additional actual fraudulent transfers to the Foreign Affiliates that have not been identified to date and included on the attached Schedules because of the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and

their co-conspirators to conceal the existence and extent of the Bank Fraud. The Trustee reserves all rights to identify and avoid additional actual fraudulent transfers that are identified in the course of the Trustee's ongoing investigation.

## CLAIMS FOR RELIEF

## COUNT 1

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under N.Y. DCL §§ 276 and 278 and 11 U.S.C. §§ 544(b)(1) and 550(a)**
**(DRUS)**

114.   Plaintiff restates and re-alleges paragraphs 1 through 113 of this Complaint as though fully set forth herein.

115.   The Debtors made numerous transfers to DRUS, including, but not limited to, those listed on Schedule A, attached hereto. Upon information and belief, in addition to the transfers to DRUS listed on Schedule A, the Debtors likely made additional transfers to DRUS that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**DRUS Transfers**").

116.   The DRUS Transfers constituted transfers of interests of the Debtors in property.

117.   The DRUS Transfers were made to or for the benefit of DRUS.

118.   The DRUS Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the DRUS Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the DRUS Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations. This result hindered, delayed, and defrauded the Debtors' creditors.

119.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the DRUS Transfers set aside, or who could disregard the DRUS Transfers and attach or levy execution upon the property conveyed, under section 278 of the New York Debtor & Creditor Law.

120.     Under section 276 of the New York Debtor & Creditor Law and section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid the DRUS Transfers made within six years before the commencement of the Debtors' chapter 11 cases.

121.     New York law further affords the Trustee two years from the time a fraud is discovered to avoid any transfers made in furtherance of that fraud. The Bank Fraud and the DRUS Transfers could not have been discovered and challenged prior to the commencement of the Debtors' chapter 11 cases because Nirav Modi and his co-conspirators, including the CEO and CFO of each Debtor, successfully concealed the existence and extent of the Bank Fraud from then-present creditors until after the commencement of the Debtors' chapter 11 cases. *See Fread v. Grabowski*, 159 A.D.2d 550, 551 (N.Y. App. Div. 1990) (discovery statute triggered by fraudulent concealment and affirmative misrepresentations); *accord Trepuk v. Frank*, 44 N.Y.2d 723, 724 (1978); *Felshman v. Yamali*, 106 A.D.3d 948, 949 (N.Y. App. Div. 2013); *Pericon v. Ruck*, 56 A.D.3d 635, 636–37 (N.Y. App. Div. 2008).

122.     Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the DRUS Transfers for the benefit of the Debtors' estates from DRUS, the entity to or for whose benefit the DRUS Transfers were made, and from any subsequent transferees.

123.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and as otherwise permitted by law.

## COUNT 2

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276 and 278 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Solar)

124.    Plaintiff restates and re-alleges paragraphs 1 through 123 of this Complaint as though fully set forth herein.

125.    The Debtors made numerous transfers to Solar, including, but not limited to, those listed on Schedule B, attached hereto. Upon information and belief, in addition to the transfers to Solar listed on Schedule B, the Debtors likely made additional transfers to Solar that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**Solar Transfers**").

126.    The Solar Transfers constituted transfers of interests of the Debtors in property.

127.    The Solar Transfers were made to or for the benefit of Solar.

128.    The Solar Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Solar Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the Solar Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations. This result hindered, delayed, and defrauded the Debtors' creditors.

129.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Solar Transfers set aside, or who could disregard the Solar Transfers and attach or levy execution upon the property conveyed, under section 278 of the New York Debtor & Creditor Law.

130.    Under section 276 of the New York Debtor & Creditor Law and section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid the Solar Transfers made within six years before the commencement of the Debtors' chapter 11 cases.

131.    New York law further affords the Trustee two years from the time a fraud is discovered to avoid any transfers made in furtherance of that fraud. The Bank Fraud and the Solar Transfers could not have been discovered and challenged prior to the commencement of the Debtors' chapter 11 cases because Nirav Modi and his co-conspirators, including the CEO and CFO of each Debtor, successfully concealed the existence and extent of the Bank Fraud from then-present creditors until after the commencement of the Debtors' chapter 11 cases. *See Fread v. Grabowski*, 159 A.D.2d 550, 551 (N.Y. App. Div. 1990) (discovery statute triggered by fraudulent concealment and affirmative misrepresentations); *accord Trepuk v. Frank*, 44 N.Y.2d 723, 724 (1978); *Felshman v. Yamali*, 106 A.D.3d 948, 949 (N.Y. App. Div. 2013); *Pericon v. Ruck*, 56 A.D.3d 635, 636–37 (N.Y. App. Div. 2008).

132.    Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the Solar Transfers for the benefit of the Debtors' estates from Solar, the entity to or for whose benefit the Solar Transfers were made, and from any subsequent transferees.

133.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and as otherwise permitted by law.

**COUNT 3**

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under N.Y. DCL §§ 276 and 278 and 11 U.S.C. §§ 544(b)(1) and 550(a)**
**(Stellar)**

134.    Plaintiff restates and re-alleges paragraphs 1 through 133 of this Complaint as though fully set forth herein.

135.    The Debtors made numerous transfers to Stellar, including, but not limited to, those listed on Schedule C, attached hereto. Upon information and belief, in addition to the transfers to Stellar listed on Schedule C, the Debtors likely made additional transfers to Stellar that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**Stellar Transfers**").

136.    The Stellar Transfers constituted transfers of interests of the Debtors in property.

137.    The Stellar Transfers were made to or for the benefit of Stellar.

138.    The Stellar Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Stellar Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the Stellar Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations. This result hindered, delayed, and defrauded the Debtors' creditors.

139.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Stellar Transfers set aside, or who could disregard the Stellar Transfers and attach or levy execution upon the property conveyed, under section 278 of the New York Debtor & Creditor Law.

140.     Under section 276 of the New York Debtor & Creditor Law and section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid the Stellar Transfers made within six years before the commencement of the Debtors' chapter 11 cases.

141.     New York law further affords the Trustee two years from the time a fraud is discovered to avoid any transfers made in furtherance of that fraud. The Bank Fraud and the Stellar Transfers could not have been discovered and challenged prior to the commencement of the Debtors' chapter 11 cases because Nirav Modi and his co-conspirators, including the CEO and CFO of each Debtor, successfully concealed the existence and extent of the Bank Fraud from then-present creditors until after the commencement of the Debtors' chapter 11 cases. *See Fread v. Grabowski*, 159 A.D.2d 550, 551 (N.Y. App. Div. 1990) (discovery statute triggered by fraudulent concealment and affirmative misrepresentations); *accord Trepuk v. Frank*, 44 N.Y.2d 723, 724 (1978); *Felshman v. Yamali*, 106 A.D.3d 948, 949 (N.Y. App. Div. 2013); *Pericon v. Ruck*, 56 A.D.3d 635, 636–37 (N.Y. App. Div. 2008).

142.     Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the Stellar Transfers for the benefit of the Debtors' estates from Stellar, the entity to or for whose benefit the Stellar Transfers were made, and from any subsequent transferees.

143.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and as otherwise permitted by law.

## COUNT 4

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276 and 278 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Firestar BVBA)**

144.    Plaintiff restates and re-alleges paragraphs 1 through 143 of this Complaint as though fully set forth herein.

145.    The Debtors made numerous transfers to Firestar BVBA, including, but not limited to, those listed on <u>Schedule D</u>, attached hereto. Upon information and belief, in addition to the transfers to Firestar BVBA listed on <u>Schedule D</u>, the Debtors likely made additional transfers to Firestar BVBA that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**Firestar BVBA Transfers**").

146.    The Firestar BVBA Transfers constituted transfers of interests of the Debtors in property.

147.    The Firestar BVBA Transfers were made to or for the benefit of Firestar BVBA.

148.    The Firestar BVBA Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Firestar BVBA Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the Firestar BVBA Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations. This result hindered, delayed, and defrauded the Debtors' creditors.

149.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Firestar BVBA Transfers set aside, or who could disregard the Firestar

BVBA Transfers and attach or levy execution upon the property conveyed, under section 278 of the New York Debtor & Creditor Law.

150.    Under section 276 of the New York Debtor & Creditor Law and section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid the Firestar BVBA Transfers made within six years before the commencement of the Debtors' chapter 11 cases.

151.    New York law further affords the Trustee two years from the time a fraud is discovered to avoid any transfers made in furtherance of that fraud. The Bank Fraud and the Firestar BVBA Transfers could not have been discovered and challenged prior to the commencement of the Debtors' chapter 11 cases because Nirav Modi and his co-conspirators, including the CEO and CFO of each Debtor, successfully concealed the existence and extent of the Bank Fraud from then-present creditors until after the commencement of the Debtors' chapter 11 cases. *See Fread v. Grabowski*, 159 A.D.2d 550, 551 (N.Y. App. Div. 1990) (discovery statute triggered by fraudulent concealment and affirmative misrepresentations); *accord Trepuk v. Frank*, 44 N.Y.2d 723, 724 (1978); *Felshman v. Yamali*, 106 A.D.3d 948, 949 (N.Y. App. Div. 2013); *Pericon v. Ruck*, 56 A.D.3d 635, 636–37 (N.Y. App. Div. 2008).

152.    Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the Firestar BVBA Transfers for the benefit of the Debtors from Firestar BVBA, the entity to or for whose benefit the Firestar BVBA Transfers were made, and from any subsequent transferees.

153.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and as otherwise permitted by law.

## COUNT 5

**Avoidance and Recovery of Actual Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
(Firestar BVBA)**

154.     Plaintiff restates and re-alleges paragraphs 1 through 153 of this Complaint as though fully set forth herein.

155.     The Debtors made numerous transfers to Firestar BVBA within two years of the commencement of the Debtors' chapter 11 cases, including, but not limited to, certain transfers listed on Schedule D, attached hereto. Upon information and belief, in addition to the transfers made within two years of the commencement of the Debtors' chapter 11 cases that are listed on Schedule D, the Debtors likely made additional transfers to Firestar BVBA within two years of the commencement of the Debtors' chapter 11 cases that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**Two-Year Firestar BVBA Transfers**").

156.     The Two-Year Firestar BVBA Transfers constituted transfers of interests of the Debtors in property.

157.     The Two-Year Firestar BVBA Transfers were made to or for the benefit of Firestar BVBA.

158.     The Two-Year Firestar BVBA Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Two-Year Firestar BVBA Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the Two-Year Firestar BVBA Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

159.    The Trustee may avoid the Two-Year Firestar BVBA Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

160.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Two-Year Firestar BVBA Transfers for the benefit of the Debtors' estates from Firestar BVBA, the entity to or for whose benefit the Two-Year Firestar BVBA Transfers were made, and from any subsequent transferees.

## COUNT 6

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276 and 278 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (FDL)

161.    Plaintiff restates and re-alleges paragraphs 1 through 160 of this Complaint as though fully set forth herein.

162.    The Debtors made numerous transfers to FDL, including, but not limited to, those listed on Schedule E, attached hereto. Upon information and belief, in addition to the transfers to FDL listed on Schedule E, the Debtors likely made additional transfers to FDL that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**FDL Transfers**").

163.    The FDL Transfers constituted transfers of interests of the Debtors in property.

164.    The FDL Transfers were made to or for the benefit of FDL.

165.    The FDL Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the FDL Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the FDL Transfers was to deplete the Debtors' property and frustrate

satisfaction of the Debtors' legitimate obligations. This result hindered, delayed, and defrauded the Debtors' creditors.

166.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the FDL Transfers set aside, or who could disregard the FDL Transfers and attach or levy execution upon the property conveyed, under section 278 of the New York Debtor & Creditor Law.

167.    Under section 276 of the New York Debtor & Creditor Law and section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid the FDL Transfers made within six years before the commencement of the Debtors' chapter 11 cases.

168.    New York law further affords the Trustee two years from the time a fraud is discovered to avoid any transfers made in furtherance of that fraud. The Bank Fraud and the FDL Transfers could not have been discovered and challenged prior to the commencement of the Debtors' chapter 11 cases because Nirav Modi and his co-conspirators, including the CEO and CFO of each Debtor, successfully concealed the existence and extent of the Bank Fraud from then-present creditors until after the commencement of the Debtors' chapter 11 cases. *See Fread v. Grabowski*, 159 A.D.2d 550, 551 (N.Y. App. Div. 1990) (discovery statute triggered by fraudulent concealment and affirmative misrepresentations); *accord Trepuk v. Frank*, 44 N.Y.2d 723, 724 (1978); *Felshman v. Yamali*, 106 A.D.3d 948, 949 (N.Y. App. Div. 2013); *Pericon v. Ruck*, 56 A.D.3d 635, 636–37 (N.Y. App. Div. 2008).

169.    Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the FDL Transfers for the benefit of the Debtors from FDL, the entity to or for whose benefit the FDL Transfers were made, and from any subsequent transferees.

170.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this

claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and

as otherwise permitted by law.

## COUNT 7

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276 and 278 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (FDIPL)

171.     Plaintiff restates and re-alleges paragraphs 1 through 170 of this Complaint as

though fully set forth herein.

172.     The Debtors made numerous transfers to FDIPL, including, but not limited to,

those listed on Schedule F, attached hereto. Upon information and belief, in addition to the

transfers to FDIPL listed on Schedule F, the Debtors likely made additional transfers to FDIPL

that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi,

and their co-conspirators to conceal the Bank Fraud (collectively, the "**FDIPL Transfers**").

173.     The FDIPL Transfers constituted transfers of interests of the Debtors in property.

174.     The FDIPL Transfers were made to or for the benefit of FDIPL.

175.     The FDIPL Transfers were made with the actual intent to hinder, delay, or defraud

the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators

approved the FDIPL Transfers in order to perpetuate the Bank Fraud and to launder and siphon

its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The

natural consequence of the FDIPL Transfers was to deplete the Debtors' property and frustrate

satisfaction of the Debtors' legitimate obligations. This result hindered, delayed, and defrauded

the Debtors' creditors.

176.     Actual creditors, including but not limited to the Debtors' vendors and suppliers,

exist who could have the FDIPL Transfers set aside, or who could disregard the FDIPL Transfers

and attach or levy execution upon the property conveyed, under section 278 of the New York

Debtor & Creditor Law.

177.    Under section 276 of the New York Debtor & Creditor Law and section 544(b)(1)

of the Bankruptcy Code, the Trustee may avoid the FDIPL Transfers made within six years before

the commencement of the Debtors' chapter 11 cases.

178.    New York law further affords the Trustee two years from the time a fraud is

discovered to avoid any transfers made in furtherance of that fraud. The Bank Fraud and the

FDIPL Transfers could not have been discovered and challenged prior to the commencement of

the Debtors' chapter 11 cases because Nirav Modi and his co-conspirators, including the CEO and

CFO of each Debtor, successfully concealed the existence and extent of the Bank Fraud from then-

present creditors until after the commencement of the Debtors' chapter 11 cases. *See Fread v.

Grabowski*, 159 A.D.2d 550, 551 (N.Y. App. Div. 1990) (discovery statute triggered by fraudulent

concealment and affirmative misrepresentations); *accord Trepuk v. Frank*, 44 N.Y.2d 723, 724

(1978); *Felshman v. Yamali*, 106 A.D.3d 948, 949 (N.Y. App. Div. 2013); *Pericon v. Ruck*, 56 A.D.3d

635, 636–37 (N.Y. App. Div. 2008).

179.    Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value

of the FDIPL Transfers for the benefit of the Debtors from FDIPL, the entity to or for whose benefit

the FDIPL Transfers were made, and from any subsequent transferees.

180.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this

claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and

as otherwise permitted by law.

**COUNT 8**

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)**
**(FDIPL)**

181.    Plaintiff restates and re-alleges paragraphs 1 through 180 of this Complaint as though fully set forth herein.

182.    The Debtors made numerous transfers to FDIPL within two years of the commencement of the Debtors' chapter 11 cases, including, but not limited to, certain transfers listed on <u>Schedule F</u>, attached hereto. Upon information and belief, in addition to the transfers made within two years of the commencement of the Debtors' chapter 11 cases that are listed on <u>Schedule F</u>, the Debtors likely made additional transfers to FDIPL within two years of the commencement of the Debtors' chapter 11 cases that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**Two-Year FDIPL Transfers**").

183.    The Two-Year FDIPL Transfers constituted transfers of interests of the Debtors in property.

184.    The Two-Year FDIPL Transfers were made to or for the benefit of FDIPL.

185.    The Two-Year FDIPL Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Two-Year FDIPL Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the Two-Year FDIPL Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

186.    The Trustee may avoid the Two-Year FDIPL Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

187.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Two-Year FDIPL Transfers for the benefit of the Debtors' estates from FDIPL, the entity to or for whose benefit the Two-Year FDIPL Transfers were made, and from any subsequent transferees.

**COUNT 9**

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276 and 278 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(FHL)**

188.    Plaintiff restates and re-alleges paragraphs 1 through 187 of this Complaint as though fully set forth herein.

189.    The Debtors made numerous transfers to FHL, including, but not limited to, those listed on Schedule G, attached hereto. Upon information and belief, in addition to the transfers to FHL listed on Schedule G, the Debtors likely made additional transfers to FHL that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**FHL Transfers**").

190.    The FHL Transfers constituted transfers of interests of the Debtors in property.

191.    The FHL Transfers were made to or for the benefit of FHL.

192.    The FHL Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the FHL Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the FHL Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations. This result hindered, delayed, and defrauded the Debtors' creditors.

193.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the FHL Transfers set aside, or who could disregard the FHL Transfers and

attach or levy execution upon the property conveyed, under section 278 of the New York Debtor & Creditor Law.

194.     New York law further affords the Trustee two years from the time a fraud is discovered to avoid any transfers made in furtherance of that fraud. The Bank Fraud and the FHL Transfers could not have been discovered and challenged prior to the commencement of the Debtors' chapter 11 cases because Nirav Modi and his co-conspirators, including the CEO and CFO of each Debtor, successfully concealed the existence and extent of the Bank Fraud from then-present creditors until after the commencement of the Debtors' chapter 11 cases. *See Fread v. Grabowski*, 159 A.D.2d 550, 551 (N.Y. App. Div. 1990) (discovery statute triggered by fraudulent concealment and affirmative misrepresentations); *accord Trepuk v. Frank*, 44 N.Y.2d 723, 724 (1978); *Felshman v. Yamali*, 106 A.D.3d 948, 949 (N.Y. App. Div. 2013); *Pericon v. Ruck*, 56 A.D.3d 635, 636–37 (N.Y. App. Div. 2008).

195.     Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the FHL Transfers for the benefit of the Debtors from FHL, the entity to or for whose benefit the FHL Transfers were made, and from any subsequent transferees.

196.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and as otherwise permitted by law.

## COUNT 10

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (FHL)

197.     Plaintiff restates and re-alleges paragraphs 1 through 196 of this Complaint as though fully set forth herein.

198.     The Debtors made numerous transfers to FHL within two years of the commencement of the Debtors' chapter 11 cases, including, but not limited to, certain transfers listed on <u>Schedule G</u>, attached hereto. Upon information and belief, in addition to the transfers made within two years of the commencement of the Debtors' chapter 11 cases that are listed on <u>Schedule G</u>, the Debtors likely made additional transfers to FHL within two years of the commencement of the Debtors' chapter 11 cases that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**Two-Year FHL Transfers**").

199.     The Two-Year FHL Transfers constituted transfers of interests of the Debtors in property.

200.     The Two-Year FHL Transfers were made to or for the benefit of FHL.

201.     The Two-Year FHL Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Two-Year FHL Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the Two-Year FHL Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

202.     The Trustee may avoid the Two-Year FHL Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

44

203.   Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Two-Year FHL Transfers for the benefit of the Debtors' estates from FHL, the entity to or for whose benefit the Two-Year FHL Transfers were made, and from any subsequent transferees.

## COUNT 11

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276 and 278 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (NML)

204.   Plaintiff restates and re-alleges paragraphs 1 through 203 of this Complaint as though fully set forth herein.

205.   The Debtors made numerous transfers to NML, including, but not limited to, those listed on Schedule H, attached hereto. Upon information and belief, in addition to the transfers to NML listed on Schedule H, the Debtors likely made additional transfers to NML that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**NML Transfers**").

206.   The NML Transfers constituted transfers of interests of the Debtors in property.

207.   The NML Transfers were made to or for the benefit of NML.

208.   The NML Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the NML Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the NML Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations. This result hindered, delayed, and defrauded the Debtors' creditors.

209.   Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the NML Transfers set aside, or who could disregard the NML Transfers

and attach or levy execution upon the property conveyed, under section 278 of the New York Debtor & Creditor Law.

210.    New York law further affords the Trustee two years from the time a fraud is discovered to avoid any transfers made in furtherance of that fraud. The Bank Fraud and the NML Transfers could not have been discovered and challenged prior to the commencement of the Debtors' chapter 11 cases because Nirav Modi and his co-conspirators, including the CEO and CFO of each Debtor, successfully concealed the existence and extent of the Bank Fraud from then-present creditors until after the commencement of the Debtors' chapter 11 cases. *See Fread v. Grabowski*, 159 A.D.2d 550, 551 (N.Y. App. Div. 1990) (discovery statute triggered by fraudulent concealment and affirmative misrepresentations); *accord Trepuk v. Frank*, 44 N.Y.2d 723, 724 (1978); *Felshman v. Yamali*, 106 A.D.3d 948, 949 (N.Y. App. Div. 2013); *Pericon v. Ruck*, 56 A.D.3d 635, 636–37 (N.Y. App. Div. 2008).

211.    Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the NML Transfers for the benefit of the Debtors from NML, the entity to or for whose benefit the NML Transfers were made, and from any subsequent transferees.

212.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and as otherwise permitted by law.

## COUNT 12

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (NML)

213.     Plaintiff restates and re-alleges paragraphs 1 through 212 of this Complaint as though fully set forth herein.

214.     The Debtors made numerous transfers to NML within two years of the commencement of the Debtors' chapter 11 cases, including, but not limited to, certain transfers listed on <u>Schedule H</u>, attached hereto. Upon information and belief, in addition to the transfers made within two years of the commencement of the Debtors' chapter 11 cases that are listed on <u>Schedule H</u>, the Debtors likely made additional transfers to NML within two years of the commencement of the Debtors' chapter 11 cases that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**Two-Year NML Transfers**").

215.     The Two-Year NML Transfers constituted transfers of interests of the Debtors in property.

216.     The Two-Year NML Transfers were made to or for the benefit of NML.

217.     The Two-Year NML Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Two-Year NML Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the Two-Year NML Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

218.     The Trustee may avoid the Two-Year NML Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

219.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Two-Year NML Transfers for the benefit of the Debtors' estates from NML, the entity to or for whose benefit the Two-Year NML Transfers were made, and from any subsequent transferees.

## COUNT 13

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276 and 278 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (FIL)

220.    Plaintiff restates and re-alleges paragraphs 1 through 219 of this Complaint as though fully set forth herein.

221.    The Debtors made numerous transfers to FIL, including, but not limited to, those listed on Schedule I, attached hereto. Upon information and belief, in addition to the transfers to FIL listed on Schedule I, the Debtors likely made additional transfers to FIL that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**FIL Transfers**").

222.    The FIL Transfers constituted transfers of interests of the Debtors in property.

223.    The FIL Transfers were made to or for the benefit of FIL.

224.    The FIL Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the FIL Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the FIL Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations. This result hindered, delayed, and defrauded the Debtors' creditors.

225.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the FIL Transfers set aside, or who could disregard the FIL Transfers and

attach or levy execution upon the property conveyed, under section 278 of the New York Debtor & Creditor Law.

226.    New York law further affords the Trustee two years from the time a fraud is discovered to avoid any transfers made in furtherance of that fraud. The Bank Fraud and the FIL Transfers could not have been discovered and challenged prior to the commencement of the Debtors' chapter 11 cases because Nirav Modi and his co-conspirators, including the CEO and CFO of each Debtor, successfully concealed the existence and extent of the Bank Fraud from then-present creditors until after the commencement of the Debtors' chapter 11 cases. *See Fread v. Grabowski*, 159 A.D.2d 550, 551 (N.Y. App. Div. 1990) (discovery statute triggered by fraudulent concealment and affirmative misrepresentations); *accord Trepuk v. Frank*, 44 N.Y.2d 723, 724 (1978); *Felshman v. Yamali*, 106 A.D.3d 948, 949 (N.Y. App. Div. 2013); *Pericon v. Ruck*, 56 A.D.3d 635, 636–37 (N.Y. App. Div. 2008).

227.    Under section 550(a) of the Bankruptcy Code, the Trustee may recover the value of the FIL Transfers for the benefit of the Debtors from FIL, the entity to or for whose benefit the FIL Transfers were made, and from any subsequent transferees.

228.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and as otherwise permitted by law.

## COUNT 14

**Avoidance and Recovery of Actual Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
(FIL)**

229.    Plaintiff restates and re-alleges paragraphs 1 through 228 of this Complaint as though fully set forth herein.

230.    The Debtors made numerous transfers to FIL within two years of the commencement of the Debtors' chapter 11 cases, including, but not limited to, certain transfers listed on Schedule I, attached hereto. Upon information and belief, in addition to the transfers made within two years of the commencement of the Debtors' chapter 11 cases that are listed on Schedule I, the Debtors likely made additional transfers to FIL within two years of the commencement of the Debtors' chapter 11 cases that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**Two-Year FIL Transfers**").

231.    The Two-Year FIL Transfers constituted transfers of interests of the Debtors in property.

232.    The Two-Year FIL Transfers were made to or for the benefit of FIL.

233.    The Two-Year FIL Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Two-Year FIL Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the Two-Year FIL Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

234.    The Trustee may avoid the Two-Year FIL Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

50

235.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Two-Year FIL Transfers for the benefit of the Debtors' estates from FIL, the entity to or for whose benefit the Two-Year FIL Transfers were made, and from any subsequent transferees.

## COUNT 15

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276 and 278
(Firestar BVBA Affiliate Transfers)**

236.     Plaintiff restates and re-alleges paragraphs 1 through 235 of this Complaint as though fully set forth herein.

237.     The U.S. Affiliates made numerous transfers to Firestar BVBA, including, but not limited to, those listed on Schedule J, attached hereto. Upon information and belief, in addition to the transfers to Firestar BVBA listed on Schedule J, the U.S. Affiliates likely made additional transfers to Firestar BVBA that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**Firestar BVBA Affiliate Transfers**").

238.     The Firestar BVBA Affiliate Transfers constituted transfers of interests of the U.S. Affiliates in property.

239.     The Firestar BVBA Affiliate Transfers were made to or for the benefit of Firestar BVBA.

240.     The Firestar BVBA Affiliate Transfers were made with the actual intent to hinder, delay, or defraud the U.S. Affiliates' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Firestar BVBA Affiliate Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the Firestar BVBA Affiliate Transfers was to deplete the U.S. Affiliates' property and frustrate satisfaction of the U.S.

Affiliates' legitimate obligations. This result hindered, delayed, and defrauded the U.S. Affiliates'
creditors.

241.    The Trustee is a judgment creditor of the U.S. Affiliates. The Trustee, as a creditor
of the U.S. Affiliates, may set aside the Firestar BVBA Affiliate Transfers, disregard the Firestar
BVBA Affiliate Transfers, and attach or levy execution upon the property conveyed under
section 278 of the New York Debtor & Creditor Law.

242.    Alternatively, the Trustee is entitled to monetary damages in the amount of the
Firestar BVBA Affiliate Transfers.

243.    Under New York Civil Practice Law and Rules section 213, the Trustee has six
years from the date of the Firestar BVBA Affiliate Transfers to bring a claim for actual fraudulent
conveyance.

244.    New York law further affords the Trustee two years from the time a fraud is
discovered to avoid any transfers made in furtherance of that fraud. The Bank Fraud and the
Firestar BVBA Affiliate Transfers could not have been discovered and challenged prior to the
commencement of the Debtors' chapter 11 cases because Nirav Modi and his co-conspirators,
including the CEO and CFO of each Debtor, successfully concealed the existence and extent of
the Bank Fraud from then-present creditors until after the commencement of the Debtors' chapter
11 cases. *See Fread v. Grabowski*, 159 A.D.2d 550, 551 (N.Y. App. Div. 1990) (discovery statute
triggered by fraudulent concealment and affirmative misrepresentations); *accord Trepuk v. Frank*,
44 N.Y.2d 723, 724 (1978); *Felshman v. Yamali*, 106 A.D.3d 948, 949 (N.Y. App. Div. 2013); *Pericon
v. Ruck*, 56 A.D.3d 635, 636–37 (N.Y. App. Div. 2008).

245.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this
claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and
as otherwise permitted by law.

## COUNT 16

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276 and 278
### (FDL Affiliate Transfers)

246.     Plaintiff restates and re-alleges paragraphs 1 through 245 of this Complaint as though fully set forth herein.

247.     The U.S. Affiliates made numerous transfers to FDL, including, but not limited to, those listed on Schedule K, attached hereto. Upon information and belief, in addition to the transfers to FDL listed on Schedule K, the U.S. Affiliates likely made additional transfers to FDL that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**FDL Affiliate Transfers**").

248.     The FDL Affiliate Transfers constituted transfers of interests of the U.S. Affiliates in property.

249.     The FDL Affiliate Transfers were made to or for the benefit of FDL.

250.     The FDL Affiliate Transfers were made with the actual intent to hinder, delay, or defraud the U.S. Affiliates' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the FDL Affiliate Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the FDL Affiliate Transfers was to deplete the U.S. Affiliates' property and frustrate satisfaction of the U.S. Affiliates' legitimate obligations. This result hindered, delayed, and defrauded the U.S. Affiliates' creditors.

251.     The Trustee is a judgment creditor of the U.S. Affiliates. The Trustee, as a creditor of the U.S. Affiliates, may set aside the FDL Affiliate Transfers, disregard the FDL Affiliate Transfers, and attach or levy execution upon the property conveyed under section 278 of the New York Debtor & Creditor Law.

252.     Alternatively, the Trustee is entitled to monetary damages in the amount of the FDL Affiliate Transfers.

253.     Under New York Civil Practice Law and Rules section 213, the Trustee has six years from the date of the FDL Affiliate Transfers to bring a claim for actual fraudulent conveyance.

254.     New York law further affords the Trustee two years from the time a fraud is discovered to avoid any transfers made in furtherance of that fraud. The Bank Fraud and the FDL Affiliate Transfers could not have been discovered and challenged prior to the commencement of the Debtors' chapter 11 cases because Nirav Modi and his co-conspirators, including the CEO and CFO of each Debtor, successfully concealed the existence and extent of the Bank Fraud from then-present creditors until after the commencement of the Debtors' chapter 11 cases. *See Fread v. Grabowski*, 159 A.D.2d 550, 551 (N.Y. App. Div. 1990) (discovery statute triggered by fraudulent concealment and affirmative misrepresentations); *accord Trepuk v. Frank*, 44 N.Y.2d 723, 724 (1978); *Felshman v. Yamali*, 106 A.D.3d 948, 949 (N.Y. App. Div. 2013); *Pericon v. Ruck*, 56 A.D.3d 635, 636–37 (N.Y. App. Div. 2008).

255.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and as otherwise permitted by law.

## COUNT 17

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276 and 278
### (FDIPL Affiliate Transfers)

256.     Plaintiff restates and re-alleges paragraphs 1 through 255 of this Complaint as
though fully set forth herein.

257.     The U.S. Affiliates made numerous transfers to FDIPL, including, but not limited
to, those listed on Schedule L, attached hereto. Upon information and belief, in addition to the
transfers to FDIPL listed on Schedule L, the U.S. Affiliates likely made additional transfers to
FDIPL that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay
Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**FDIPL Affiliate
Transfers**").

258.     The FDIPL Affiliate Transfers constituted transfers of interests of the U.S. Affiliates
in property.

259.     The FDIPL Affiliate Transfers were made to or for the benefit of FDIPL.

260.     The FDIPL Affiliate Transfers were made with the actual intent to hinder, delay,
or defraud the U.S. Affiliates' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-
conspirators approved the FDIPL Affiliate Transfers in order to perpetuate the Bank Fraud and
to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their
families, and others. The natural consequence of the FDIPL Affiliate Transfers was to deplete the
U.S. Affiliates' property and frustrate satisfaction of the U.S. Affiliates' legitimate obligations.
This result hindered, delayed, and defrauded the U.S. Affiliates' creditors.

261.     The Trustee is a judgment creditor of the U.S. Affiliates. The Trustee, as a creditor
of the U.S. Affiliates, may set aside the FDIPL Affiliate Transfers, disregard the FDIPL Affiliate

Transfers, and attach or levy execution upon the property conveyed under section 278 of the New York Debtor & Creditor Law.

262.    Alternatively, the Trustee is entitled to monetary damages in the amount of the FDIPL Affiliate Transfers.

263.    Under New York Civil Practice Law and Rules section 213, the Trustee has six years from the date of the FDIPL Affiliate Transfers to bring a claim for actual fraudulent conveyance.

264.    New York law further affords the Trustee two years from the time a fraud is discovered to avoid any transfers made in furtherance of that fraud. The Bank Fraud and the FDIPL Affiliate Transfers could not have been discovered and challenged prior to the commencement of the Debtors' chapter 11 cases because Nirav Modi and his co-conspirators, including the CEO and CFO of each Debtor, successfully concealed the existence and extent of the Bank Fraud from then-present creditors until after the commencement of the Debtors' chapter 11 cases. *See Fread v. Grabowski*, 159 A.D.2d 550, 551 (N.Y. App. Div. 1990) (discovery statute triggered by fraudulent concealment and affirmative misrepresentations); *accord Trepuk v. Frank*, 44 N.Y.2d 723, 724 (1978); *Felshman v. Yamali*, 106 A.D.3d 948, 949 (N.Y. App. Div. 2013); *Pericon v. Ruck*, 56 A.D.3d 635, 636–37 (N.Y. App. Div. 2008).

265.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and as otherwise permitted by law.

## COUNT 18

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276 and 278
(FHL Affiliate Transfers)**

266.     Plaintiff restates and re-alleges paragraphs 1 through 265 of this Complaint as though fully set forth herein.

267.     The U.S. Affiliates made numerous transfers to FHL, including, but not limited to, those listed on <u>Schedule M</u>, attached hereto. Upon information and belief, in addition to the transfers to FHL listed on <u>Schedule M</u>, the U.S. Affiliates likely made additional transfers to FHL that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**FHL Affiliate Transfers**").

268.     The FHL Affiliate Transfers constituted transfers of interests of the U.S. Affiliates in property.

269.     The FHL Affiliate Transfers were made to or for the benefit of FHL.

270.     The FHL Affiliate Transfers were made with the actual intent to hinder, delay, or defraud the U.S. Affiliates' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the FHL Affiliate Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the FHL Affiliate Transfers was to deplete the U.S. Affiliates' property and frustrate satisfaction of the U.S. Affiliates' legitimate obligations. This result hindered, delayed, and defrauded the U.S. Affiliates' creditors.

271.     The Trustee is a judgment creditor of the U.S. Affiliates. The Trustee, as a creditor of the U.S. Affiliates, may set aside the FHL Affiliate Transfers, disregard the FHL Affiliate Transfers, and attach or levy execution upon the property conveyed under section 278 of the New York Debtor & Creditor Law.

272.     Alternatively, the Trustee is entitled to monetary damages in the amount of the FHL Affiliate Transfers.

273.     Under New York Civil Practice Law and Rules section 213, the Trustee has six years from the date of the FHL Affiliate Transfers to bring a claim for actual fraudulent conveyance.

274.     New York law further affords the Trustee two years from the time a fraud is discovered to avoid any transfers made in furtherance of that fraud. The Bank Fraud and the FHL Affiliate Transfers could not have been discovered and challenged prior to the commencement of the Debtors' chapter 11 cases because Nirav Modi and his co-conspirators, including the CEO and CFO of each Debtor, successfully concealed the existence and extent of the Bank Fraud from then-present creditors until after the commencement of the Debtors' chapter 11 cases. *See Fread v. Grabowski*, 159 A.D.2d 550, 551 (N.Y. App. Div. 1990) (discovery statute triggered by fraudulent concealment and affirmative misrepresentations); *accord Trepuk v. Frank*, 44 N.Y.2d 723, 724 (1978); *Felshman v. Yamali*, 106 A.D.3d 948, 949 (N.Y. App. Div. 2013); *Pericon v. Ruck*, 56 A.D.3d 635, 636–37 (N.Y. App. Div. 2008).

275.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and as otherwise permitted by law.

## COUNT 19

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276 and 278
### (NML Affiliate Transfers)

276.     Plaintiff restates and re-alleges paragraphs 1 through 275 of this Complaint as though fully set forth herein.

277.     The U.S. Affiliates made numerous transfers to NML, including, but not limited to, those listed on Schedule N, attached hereto. Upon information and belief, in addition to the transfers to NML listed on Schedule N, the U.S. Affiliates likely made additional transfers to NML that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**NML Affiliate Transfers**").

278.     The NML Affiliate Transfers constituted transfers of interests of the U.S. Affiliates in property.

279.     The NML Affiliate Transfers were made to or for the benefit of NML.

280.     The NML Affiliate Transfers were made with the actual intent to hinder, delay, or defraud the U.S. Affiliates' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the NML Affiliate Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the NML Affiliate Transfers was to deplete the U.S. Affiliates' property and frustrate satisfaction of the U.S. Affiliates' legitimate obligations. This result hindered, delayed, and defrauded the U.S. Affiliates' creditors.

281.     The Trustee is a judgment creditor of the U.S. Affiliates. The Trustee, as a creditor of the U.S. Affiliates, may set aside the NML Affiliate Transfers, disregard the NML Affiliate Transfers, and attach or levy execution upon the property conveyed under section 278 of the New York Debtor & Creditor Law.

282.    Alternatively, the Trustee is entitled to monetary damages in the amount of the NML Affiliate Transfers.

283.    Under New York Civil Practice Law and Rules section 213, the Trustee has six years from the date of the NML Affiliate Transfers to bring a claim for actual fraudulent conveyance.

284.    New York law further affords the Trustee two years from the time a fraud is discovered to avoid any transfers made in furtherance of that fraud. The Bank Fraud and the NML Affiliate Transfers could not have been discovered and challenged prior to the commencement of the Debtors' chapter 11 cases because Nirav Modi and his co-conspirators, including the CEO and CFO of each Debtor, successfully concealed the existence and extent of the Bank Fraud from then-present creditors until after the commencement of the Debtors' chapter 11 cases. *See Fread v. Grabowski*, 159 A.D.2d 550, 551 (N.Y. App. Div. 1990) (discovery statute triggered by fraudulent concealment and affirmative misrepresentations); *accord Trepuk v. Frank*, 44 N.Y.2d 723, 724 (1978); *Felshman v. Yamali*, 106 A.D.3d 948, 949 (N.Y. App. Div. 2013); *Pericon v. Ruck*, 56 A.D.3d 635, 636–37 (N.Y. App. Div. 2008).

285.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and as otherwise permitted by law.

## COUNT 20

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276 and 278
(FIL Affiliate Transfers)**

286.     Plaintiff restates and re-alleges paragraphs 1 through 285 of this Complaint as though fully set forth herein.

287.     The U.S. Affiliates made numerous transfers to FIL, including, but not limited to, those listed on <u>Schedule O</u>, attached hereto. Upon information and belief, in addition to the transfers to FIL listed on <u>Schedule O</u>, the U.S. Affiliates likely made additional transfers to FIL that have not yet been discovered due to the efforts of Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators to conceal the Bank Fraud (collectively, the "**FIL Affiliate Transfers**").

288.     The FIL Affiliate Transfers constituted transfers of interests of the U.S. Affiliates in property.

289.     The FIL Affiliate Transfers were made to or for the benefit of FIL.

290.     The FIL Affiliate Transfers were made with the actual intent to hinder, delay, or defraud the U.S. Affiliates' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the FIL Affiliate Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Nirav Modi, Mihir Bhansali, their families, and others. The natural consequence of the FIL Affiliate Transfers was to deplete the U.S. Affiliates' property and frustrate satisfaction of the U.S. Affiliates' legitimate obligations. This result hindered, delayed, and defrauded the U.S. Affiliates' creditors.

291.     The Trustee is a judgment creditor of the U.S. Affiliates. The Trustee, as a creditor of the U.S. Affiliates, may set aside the FIL Affiliate Transfers, disregard the FIL Affiliate Transfers, and attach or levy execution upon the property conveyed under section 278 of the New York Debtor & Creditor Law.

292.    Alternatively, the Trustee is entitled to monetary damages in the amount of the FIL Affiliate Transfers.

293.    Under New York Civil Practice Law and Rules section 213, the Trustee has six years from the date of the FIL Affiliate Transfers to bring a claim for actual fraudulent conveyance.

294.    New York law further affords the Trustee two years from the time a fraud is discovered to avoid any transfers made in furtherance of that fraud. The Bank Fraud and the FIL Affiliate Transfers could not have been discovered and challenged prior to the commencement of the Debtors' chapter 11 cases because Nirav Modi and his co-conspirators, including the CEO and CFO of each Debtor, successfully concealed the existence and extent of the Bank Fraud from then-present creditors until after the commencement of the Debtors' chapter 11 cases. *See Fread v. Grabowski*, 159 A.D.2d 550, 551 (N.Y. App. Div. 1990) (discovery statute triggered by fraudulent concealment and affirmative misrepresentations); *accord Trepuk v. Frank*, 44 N.Y.2d 723, 724 (1978); *Felshman v. Yamali*, 106 A.D.3d 948, 949 (N.Y. App. Div. 2013); *Pericon v. Ruck*, 56 A.D.3d 635, 636–37 (N.Y. App. Div. 2008).

295.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under section 276-a of the New York Debtor & Creditor Law, and as otherwise permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors and as assignee and judgment

creditor of the U.S. Affiliates, respectfully requests that the Court:

    a.   On Count 1, enter judgment in favor of Plaintiff and against DRUS avoiding each of the DRUS Transfers and for recovery of the DRUS Transfers in the amount of $4,833,875.

    b.   On Count 2, enter judgment in favor of Plaintiff and against Solar avoiding each of the Solar Transfers and for recovery of the Solar Transfers in the amount of $7,714,175.

    c.   On Count 3, enter judgment in favor of Plaintiff and against Stellar avoiding each of the Stellar Transfers and for recovery of the Stellar Transfers in the amount of $1,237,260.

    d.   On Count 4, enter judgment in favor of Plaintiff and against Firestar BVBA avoiding each of the Firestar BVBA Transfers and for recovery of the Firestar BVBA Transfers in the amount of $13,532,129.

    e.   On Count 5, enter judgment in favor of Plaintiff and against Firestar BVBA avoiding each of the Two-Year Firestar BVBA Transfers and for recovery of the Two-Year Firestar BVBA Transfers in the amount of $8,165,595.

    f.   On Count 6, enter judgment in favor of Plaintiff and against FDL avoiding each of the FDL Transfers and for recovery of the FDL Transfers in the amount of $6,006,663.

    g.   On Count 7, enter judgment in favor of Plaintiff and against FDIPL avoiding each of the FDIPL Transfers and for recovery of the FDIPL Transfers in the amount of $74,766,651.

    h.   On Count 8, enter judgment in favor of Plaintiff and against FDIPL avoiding each of the Two-Year FDIPL Transfers and for recovery of the Two-Year FDIPL Transfers in the amount of $18,489,635.

    i.   On Count 9, enter judgment in favor of Plaintiff and against FHL avoiding each of the FHL Transfers and for recovery of the FHL Transfers in the amount of $1,000,000.

j.  On Count 10, enter judgment in favor of Plaintiff and against FHL avoiding each of the Two-Year FHL Transfers and for recovery of the Two-Year FHL Transfers in the amount of $1,000,000.

k.  On Count 11, enter judgment in favor of Plaintiff and against NML avoiding each of the NML Transfers and for recovery of the NML Transfers in the amount of $85,150.

l.  On Count 12, enter judgment in favor of Plaintiff and against NML avoiding each of the Two-Year NML Transfers and for recovery of the Two-Year NML Transfers in the amount of $85,150.

m.  On Count 13, enter judgment in favor of Plaintiff and against FIL avoiding each of the FIL Transfers and for recovery of the FIL Transfers in the amount of $122,054,686.

n.  On Count 14, enter judgment in favor of Plaintiff and against FIL avoiding each of the Two-Year FIL Transfers and for recovery of the Two-Year FIL Transfers in the amount of $13,268,608.

o.  On Count 15, enter judgment in favor of Plaintiff and against Firestar BVBA avoiding each of the Firestar BVBA Affiliate Transfers and for recovery of the Firestar BVBA Affiliate Transfers in the amount of $3,205,275.

p.  On Count 16, enter judgment in favor of Plaintiff and against FDL avoiding each of the FDL Affiliate Transfers and for recovery of the FDL Affiliate Transfers in the amount of $13,392,904.

q.  On Count 17, enter judgment in favor of Plaintiff and against FDIPL avoiding each of the FDIPL Affiliate Transfers and for recovery of the FDIPL Affiliate Transfers in the amount of $1,245,882.

r.  On Count 18, enter judgment in favor of Plaintiff and against FHL avoiding each of the FHL Transfers and for recovery of the FHL Transfers in the amount of $5,858,500.

s.  On Count 19, enter judgment in favor of Plaintiff and against NML avoiding each of the NML Affiliate Transfers and for recovery of the NML Affiliate Transfers in the amount of $6,633,586.

t.  On Count 20, enter judgment in favor of Plaintiff and against FIL avoiding each of the FIL Affiliate Transfers and for recovery of the FIL Affiliate Transfers in the amount of $775,000.

u.  Award Plaintiff his reasonable costs and expenses incurred in this action, including counsel fees pursuant to section 276-a of the New York Debtor & Creditor Law, and as otherwise permitted by law.

Dated: February 25, 2020                    Respectfully submitted,
          New York, New York

                                            **JENNER & BLOCK LLP**

                                            By: /s/ Vincent Lazar
                                            Vincent Lazar
                                            Angela Allen (admitted *pro hac vice*)
                                            William Williams (admitted *pro hac vice*)
                                            353 North Clark Street
                                            Chicago, Illinois 60654
                                            (312) 222-9350
                                            vlazar@jenner.com
                                            aallen@jenner.com
                                            wwilliams@jenner.com

                                            Carl Wedoff
                                            919 Third Avenue, 37th Floor
                                            New York, New York 10022-3908
                                            Telephone: (212) 891-1600
                                            cwedoff@jenner.com

                                            *Counsel for the Chapter 11 Trustee*